Our final case for argument today is 22-2098 Inguran v. ABS Global. Mr. Horowitz, please proceed. Thank you, Your Honor. May it please the court. The central question in this appeal is whether the Neuenheis reference discloses focusing at the vertical position inlet. What Neuenheis actually says about the vertical position inlet is that there is some vertical compression. ST's expert testified. What's the word focusing mean according to the district court which is not appealed to us? Focusing as the court instructed the jury is narrowing, pinching, or confining the particular stream or sample stream with sheath fluid causing acceleration of the sheath flow. That's at 51204. So it's not just narrowing, pinching, or confining. It requires the causing of acceleration, correct? That's right. The claim construction requires causing acceleration. Continue. Yes. And let me finish up on compression and I want to turn to acceleration. So as to compression, excuse me, as to narrowing, there's no dispute. Their expert testified that compression means narrowing and narrowing plus acceleration, which I'll get to, is focusing under the district court's claim construction. That's all you need for purposes of anticipation. You can talk about figure three. I'll pass on that for a moment. And I'll say that their expert tried to minimize the compression by saying it's slight or that's not really what Neuenheis is about. But neither of those things makes any difference in terms of what it's about, what it's really for. That's a purpose-based argument that ST has wisely abandoned on appeal. And in terms of whether it's slight, talking about the claim construction, which I just referred the court to, there's no requirement in the construction of any particular degree or magnitude of narrowing, just as in the Robert Bosch case. Can you turn to the acceleration point? Absolutely. So ST did not defend the verdict below on the basis of acceleration and for good reason. There's no serious question that when you add fluid to a channel or a pipe or a tube to which fluid is already flowing, everything's going to go faster. This is familiar to anyone who's turned up the pressure on a garden hose or a shower. More water in a pipe of consistent dimensions means more pressure, more speed. Here's the problem. You're saying that doesn't make it true or make it evidence it was before the jury? Absolutely. And there's plenty of evidence before the jury on acceleration, both with our expert and theirs. So their expert at 51… Wait, stop for a sec. Do you agree that it's called Neuenheis? Am I saying that right? That's how I've learned to say it. Okay, Neuenheis. Do you agree that Neuenheis itself doesn't speak of acceleration? The word acceleration is not in Neuenheis. And so what we have to do is we have to be convinced that this disclosure of possibly more liquid and vertical compression as a matter of inherency automatically results in acceleration, correct? Every time, all the time. Acceleration is not disclosed. So we have to read this and conclude that what is disclosed for sure causes acceleration. Sure, yeah, absolutely. That's inherency. There's no other way. I don't think anyone's characterized it as inherency, but I think we would say… I don't think it makes a difference. You can call it inherency. I think the addition of fluid to a straight channel, a person of skill would recognize that to cause focusing, which includes acceleration. The construction in this regard, acceleration, if you even read it, it says narrowing, pinching, or confining. There's a necessary causal relationship between the two things. But let me just get to the evidence on it, because as I say, it's the same on both sides. So their expert was asked… First of all, let's take a step back. Talking about how these devices work in general, our expert explained, if you add fluid, it's going to accelerate. I don't want generality. I want to see the evidence that amounts to… Because we have a jury verdict, and we have to defer to that if there's substantial evidence to support it. And so what your expert said in general doesn't contradict the possibility of substantial evidence to support the jury verdict. And so the question is, how can you prove that no reasonable person could read this passage and conclude that this would not cause acceleration? So I'll start with the new and highest reference in terms of the expert testimony, and I'll start with their expert. What their expert admitted… Which one and on what page? Dr. Vaca, 51-156 of the joint appendix. That's volume two. At the bottom, starting at line 17. You would agree with me, because the channel doesn't… Just to be clear for one second, am I understanding right that this was in the portion of this testimony directed to infringement? This had nothing to do with the new Heist reference? This has everything to do with the new Heist. This is the cross-examination on new and Heist. Oh, okay. Where does it say that? Where can I get a sense about new and Heist? I thought I understood them to say that this was in the infringement section. Can you give me the page number? The page I'm specifically looking at is 51-158. The prior page refers to new and Heist in flow cell two. At the top of 51-157, you can see we're talking about new and Heist. This is cross-examination of their expert on new and Heist. In fact, I could have looked at 51-158. Sorry, I'm on the wrong page now. 51-156. All of this is new and Heist. The question I want to direct the Court's attention to is on 156. Okay. Question. You would agree with me because the channel doesn't change in dimension here when sheath fluid is added at the vertical position inlet. That's what we're focused on. The laws of conservation of mass and momentum dictate that both the sheath fluid and the sample fluid accelerate at that point, correct? Yes. Yeah. Actually, I'm glad you brought that up. He wanted to expand. He wanted to say more than that, but he was asked the question. He gave the answer yes. This is something that Judge Connolly did consistently and I think properly throughout cross-examination. If someone wanted to say more than just answering the question, he would stop. Was there a redirect on that point? Did they indicate something else? It sounds like he was cut off. Can we go to that as well just for completeness? That's around 176. What he's saying at 176-177, he's describing, this background is helpful to understand because this is technical. Downstream of the vertical position inlet in new and Heist there are this pair of horizontal inlets that can force fluid one way or the other by adding on one side and removing from the other. That's a concept where you don't actually keep the same amount of fluid in if you remove from the other side. Is that what you want us to look at on 176? Yes. The whole 176 is this concept that I'm trying to describe. You wanted the explanation that you wanted to give. I'm not sure if it's novel, but they're talking about modulating through different ports. This is the concept of modulation where you add from one side and you subtract from the other side. That's with the horizontal control ports at the end of the channel, not the vertical position inlet. He's talking about the horizontal ones. He's saying this is a cool idea. Add here, subtract there. If you did that, and to be clear, nothing in new and Heist says you ever do that. There is no corresponding vertical position inlet on the top. Your argument is deviating a lot from what was argued to us. Why don't we stick with what was argued to us? Which, as I understand it, is that Mr. Vaca's redirect at 176 to 177 explains, especially on 177 line 3, that it's not necessarily the case that it's going to increase acceleration because there's also this modulation of flow rate that's going on at the same time. That's what they argue, that it's not necessarily the case that you're going to have an increase in acceleration because you've got the modulation of flow rates. Then I understand Newhouse to disclose that modulation of flow rates in detail on page 39980 when it's talking about figure 4, which is all about modulating flow rates. I'm by far no expert in this field, but that is what they allege is the substantial evidence for why their expert did not in fact give away the farm, as you would like us to believe, but rather explained that Newhouse doesn't disclose necessarily increasing acceleration as a result of this particular embodiment. Again, as to the basic physics, it's very important because the removal is a separate issue. What they're talking about in Newhouse with respect to the horizontal control ports in figure 3, those are the ones downstream, you can see in the upper right hand, 39980, the upper right hand view introducing fluid from the left and removing fluid from the right. The idea is if you want to keep the same dimensions, if that's what your goal was, you add from one side and subtract from the other. They describe that for the horizontal control ports. Never anywhere in Newhouse is there any suggestion because there's no other port. There's no removal from the top. There's only inlet from the bottom. They never describe adding from the bottom and removing from the top, which is what happens at the horizontal control ports if you want. But Dr. Vaca said, even with respect to the horizontal control ports, the device can focus. You're helping me with what Newhouse shows, but I was asking a much stupider question, which is, what does it actually mean to modulate flow rates? Increase here, decrease there. Change. Increase pressure, turn up the tube over here, turn down the tube over there. Your view is in the horizontal ones, they're doing it because that will move it but not change, I guess, diameter or something? It teaches you that you can. This is important because even with respect to the horizontal, Vaca admits that there is focusing with the horizontal control ports. The one as to which there is a modulation, and this is at 51.158, I believe, though we can check. I'm sorry, what? He admits that with the horizontal control ports, the one with respect to which there is... Where, what page? 51.158. Okay. So 157 is where he talks about controlling the dimensions with the horizontal control ports. He says, you don't dispute, this is 157, you don't dispute that the horizontal position inlets, they function and can function in the same way between the two, they could, and that the horizontal control ports focus from the left and right side walls, yes. They could. He says they could. They could. Sometimes they do and sometimes they don't, depending on how you operate it. But that's the point. It's a device claim. You can put ports, put fluid in, or you can take fluid out. See, here's my problem, though. My problem is you need to prove, because the reference doesn't disclose acceleration, the concept of inherency, which you admitted at the beginning is a fine way to look at this, which means it always does, that there's always going to, this reference discloses to a skilled artisan that when this embodiment is practiced and the way disclosed, there will always be acceleration. It's not a method claim. This device always inherently in every instance has the capability, unless you specifically take fluid out, unless you specifically remove from the other side in the downstream horizontal control ports, it's going to narrow. The laws of conservation of mass dictate that as he admitted. It's a device claim. The problem is, with all due respect, it might be a device claim, but the agreed upon claim construction requires causing acceleration. Yes. This device does not in use always cause acceleration. This expert has explained how, due to modulation, there may not be any acceleration caused, therefore, it doesn't necessarily meet the focusing limitation. Your Honor, respectfully, the device absolutely doesn't cause any focusing unless you run fluid through it. The device doesn't focus a sample. This expert explained how, even when you run fluid through it, there could be modulation of flow rates that, therefore, results in no acceleration. You could intentionally break it. That's what the expert testified. No, that's not intentionally breaking it. That's actually the description in the patent. Does it have modulation in the vertical one? You can increase it. You can slow it down, relatively speaking. I suppose you could put nothing through it. Again, if you put nothing through it. Doesn't Figure 4 expressly say increase vertical position flow rate and decrease vertical position flow rate? Yes. So isn't the answer to Judge Hughes' question yes? You can decrease it, but it doesn't suck it out, as in the horizontals. That's the point. In the horizontals, there's… This is you saying it. There's no evidence anywhere of this. This is the problem. You fail to present evidence. And now you want to rely on their infringement discussion or their expert to fill in blanks about inherency. I referred to their expert only because it's substantial evidence, and I don't want you to say my expert said it, and that's not good enough. I'm relying on theirs because that's all you need. It's right there on the same page, Your Honor, at 39981. When you're talking about horizontal, in that Figure 4, it says remove from left and add, remove from right and add. There's no disclosure anywhere of removal. Yes, it says you can increase and decrease the pressure. That's turning up and turning down the hose. There is nothing anywhere other than their expert's speculation. There is no discussion of speed of the sample flow anywhere in this reference, and yet that's what the claim construction that you agreed upon required. And now you want me to make assumptions or conclusions about speed when their expert is, in your best case, somewhat equivocal. But, you know, he goes on to explain that not always, and yes, it could, but other times it won't because of modulation. I don't know. I don't know how I don't, in all honesty, fault you all because this was your burden and you introduced no evidence to link this up. Your Honor, we introduced evidence of acceleration. I'm focusing on theirs for the reason that I mentioned. The reason why it's not on the face of Nuenhuis is because we're talking about something so basic that he even agreed that it would happen as a matter of the laws of conservation of mass. You don't have to say that you have to increase the pressure to make it go faster because everyone knows you have to turn up the pressure to make it go faster. But when you said that agreement, is it really just that part where it was kind of cut off and it said, yeah, and then there was a little bit? That's the agreement with respect to conservation of mass. His testimony with respect to our device, it's true, but it's the same feature at 54.22. He says you add fluid, that makes it go faster. Our expert says the same at 51.786. Again, this wasn't even a reason on which they defended the verdict below because it was so apparent to everyone involved that more fluid means faster, as I said with the shower or the garden hose example. You can't create a fact issue. You can't create substantial evidence with an expert speculation about something. He acknowledged that there would be narrowing, and then he said it's possible, if you modulate the flow rates, to avoid it. It's possible to break it. It's possible to turn it off. This is a device claim, and it's capable of practicing. We didn't talk about compression. I know that I'm into my rebuttal time. It sounds like that's not where the court's questions are focused, but I'm happy to address it. Do you want to touch on damages at all? I would love to just say one thing about them, if I may, which is just that the simple issue, I'll leave the saleable unit to the side, is that Malachowski's analysis attributes 100% of the value of the chips to the patents. We give the demonstrative on page 78 of our blue brief to show you what I'm talking about. The problem is there are undisputedly non-infringing features which contribute to focusing, which is the key functionality. He didn't distinguish between what is patented and what isn't, and we know that those non-infringing features, particularly what's called Detail B, 25388 for later, of the joint appendix, you'll see the picture. Detail B is present in our non-infringing chip, which works just as well as the infringing one. Did you have an opportunity to introduce that evidence at trial? Absolutely, but the problem is that this is an abuse of discretion to have allowed Mr. Malachowski to testify based on an erroneous theory, a legally unreliable theory. This is a challenge to the admission of the evidence. I understand, but I guess I'm wondering if that challenge about what causes the value to the chips, whether it's the patent's contribution or potentially non-infringing features, as you suggested, why that isn't potentially going to wait as opposed to admissibility. This court has a long string of cases in which an expert's failure to properly apportion is seen as part of the court's gatekeeping role. You can't have a jury hear about numbers that don't reflect at least an effort to make a proper apportionment, and he went a certain distance, but he stopped at the chip. Our contention is that the failure to do anything with respect to apportioning the non-infringing components versus the infringing components renders his testimony unreliable. The jury shouldn't have heard it, and therefore we're entitled to a new trial on damages. Tell me again, what exactly was exactly wrong with his testimony that should have made it so unreliable it couldn't have been admitted? So the exact issue that I want to focus on is that, and again, the blue brief, page 78, shows the trial demonstrative. There's corresponding testimony I can point you to as well. He says two out of six steps are carried out by the chip, on the chip. Then he says two out of six, that's 33%. Thirty-three percent of the value of the processing, therefore, is attributable to the patents. So the expert equates the chip with the patents. It was incumbent on him, because there are both infringing and non-infringing features of the chip that contribute to its function undisputedly, and I can show you why, it was incumbent on him to make a further apportionment. He didn't do that. We asked the court to exclude the testimony. Initially, his apportionment was even worse. The district court tried to get him to apportion, apportion, apportion, and he threw up his hands. Originally, there was this 50%. The district court made him adjust, and he did. And you're saying he didn't adjust enough. They should have excluded again. Is that your point? My point is that he didn't, ultimately, he can make all the different percentages he wants. He didn't get down to the value of the infringing features. And notably, when the district court said 50%, that's too high, they checked. Is 30% the limit? And what did they come back with? 30%. So I don't think that the story of the exclusion is bad for us. I think it's quite good for us. But in terms of the case law, you can forget about the story of the exclusion and focus on one thing. He equates the chip's value to the patents. That doesn't work because there are non-infringing features, and we know that those non-infringing features are important because, number one, they accuse them of infringement initially until we went on summary judgment, and number two, the new chip that we had at trial, we switched to, no impact on cost or performance, that had the non-infringing features, and it dropped the infringing ones. Did you contend that your expert provided proper apportionment, like kind of a counter testimony on that? Yes. There's a little bit of confusion. Our expert's testimony actually at trial was not based on this start with the total profits and work down. It was based on start with the cost of switching and work up. So they say, and the district court said this, that, well, since their expert relied on our expert's methodology, everything's fine. Our expert's methodology is an alternative theory in her report, which she didn't present, which she used to demonstrate why their apportionment was so bad. But at the end of her analysis, and this is at 24.099 of the joint appendix, she says, yeah, I get down to the chip, and further apportionment would likely be necessary even there. But she didn't need to show more because it showed already that Mr. Malkowski's analysis was wildly off base. That's all she was doing. I think it was 12.5%. You're saying that's not even the right one. That's not her theory. She didn't advance it at trial. And as I said, it was an alternative exercise. Her main theory was based on evidence that existed earlier about the cost of switching, which was 48 cents, and she said that should be the royalty. The jury didn't credit that, and we're not appealing that issue. I'm just saying that that wasn't her theory at trial. Okay. Well, we'll restore some rebuttal time. Why don't we hear from Mr. Schall. May it please the Court, Batik Schall for APOE is known here as ST. The question in this case, and I'm going to start with the anticipation issue, is whether a rational juror could have found that ABS failed to prove, by clear and convincing evidence, that Neuenhuis disclosed all the elements of the claim. And most of the colloquy here was about the acceleration element. And so let me start there. Chief Judge, more on you. Conceded on the other element that we talked about, the compression element? Yeah. That Neuenhuis does disclose it? No, I do not concede that. Oh, okay. I was going to ask. No, no, no, not at all. I'm happy to talk about that as well. I just wanted to know, because we're moving on to acceleration, which is where I want you to focus. But I just thought I might get a concession on the way. No, no, no, not at all. On acceleration, though, so just to be clear here, Neuenhuis, start with Neuenhuis, the actual prior art, does not mention acceleration in any way, shape, or form. It's just not in there. It doesn't talk about the velocity, the speed, anything of the flow that's going on in the invention. It's not in the article. So you would expect. Is this your argument? I mean, where in the road brief did you focus on acceleration? I thought the focus of your argument was on the fact that it said minimal, and it could have been so minimal as to not really amount to compression. So, Your Honor, we were the appellee, so their primary argument in their brief focused on compression, compression, compression. So most of our brief rebuts that element. However, even though they did not mention acceleration, our brief does. We have an entire section, a subsection in our brief, and it starts, it's subsection 2C3, Basic Principles of Physics Cannot Save ABS's Anticipation Defense. That entire section. What page? It's 42 of our brief, Your Honor. Let me just read it. Let me make sure I'm giving you the right page. Yeah, this is the right section. So 42 and 43 of our brief is where we address the principles of physics. And we actually say on 43, ABS has no other basis for proving that new in-house discloses the acceleration element of the district court's focusing construction. Right. Dr. DiCarlo, that's their expert, did not speak to the subject. ABS's bid to overturn the jury's anticipation verdict fails on that additional basis as well. That's the point of the section in 42, 43. Again, they didn't mention it in their opening brief, the second element of it. We affirmatively addressed it and say here's another basis on which to win. And it is an independent basis. And I want to explain exactly why it's laid out in those two pages. But their test, their expert did not opine on this at all. Never says that new in-house shows that there's acceleration of the stream. Our expert. But didn't their expert in the context of infringement make arguments about laws of physics that could have likewise applied here? Could have. But there's no reason to think that it would have applied to the portion of the reference that we're talking about here in new in-house. They were talking about the infringing device. We're talking about new in-house and whether figure four of new in-house in that configuration actually causes acceleration. And our expert does address it head on. And at first, it's as you had the colloquy with Mr. Horowitz. Their attorney tried to cross-examine our witness and ask the question that you heard there. You would agree with me because the channel doesn't change in dimension. And this is trying to get exactly the acceleration. It says, you would agree with me, cross-examining our expert, because the channel doesn't change in dimension here when sheath fluid is added at the vertical position inlet, the laws of conservation of mass and momentum dictate that both the sheath fluid and the sample fluid accelerate at that point. Correct? Yeah. Actually, I'm glad you brought that up because then he's cut off. So then on redirect examination, we come back to this point. And that starts at the passage that you were looking at before, at the bottom of 51175. And this is on redirect. It says, I believe Ms. Koh, referring to that testimony I just read, asked you whether the laws of conservation of mass necessarily require there to be focusing at the vertical position inlet. And I think you tried to respond and elaborate. You disagreed in this case. Can you explain? What about the vertical direction? And then he says, Neuwenhuis has the sample stream moving up and down based on introducing sample, introducing sheath flow at a faster rate or a lower rate, in order to do exactly the same positioning control. That's what Neuwenhuis figure 4 shows. And the next question, so is there necessarily focusing in the vertical direction simply because the way Neuwenhuis has configured, there's fluid being added at the vertical position inlet. Answer, not necessarily because there's also this modulation of the flow rates that's going on at the same time. So Judge Hughes, to get to your question. I'm confused. I mean, it doesn't sound like he's answering the same question that he was asked, which is all other things being the same, if you add liquid without the modulation, he's talking about modulation and stuff, which I understand to be somewhat different. If you add liquid, which results in compression, no matter how minor it is, is it theoretically possible that there's no acceleration? Your Honor, he's saying that what's going on in Neuwenhuis. I want to talk about, see, this is the problem. I think you're pointing, I wish they would have let him finish answering that question. But the first question is, is it theoretically possible to add liquid to something with this diameter, the way everything else stays the same, and assuming it discloses compression and focusing, which I read from Neuwenhuis, if you have compression and focusing, is it theoretically possible that there's no acceleration? Don't answer me with questions about modulation and how the device works. Just theoretically possible and kind of the abstract. I am not a physicist, so I don't know the answer to that. But what I can tell you… They didn't put enough evidence in, but I'm a little curious as to, because it doesn't seem like a particularly difficult concept that if you have liquid flowing through a tube and you add more, it's going to compress it, which is going to cause it to move faster. Okay. Your Honor, again, that might be right. They didn't put that on. But what is going on in Neuwenhuis is what our expert says. There is modulation of flow rates in Neuwenhuis. That's the whole point of Figure 4 in Neuwenhuis. And our expert spends pages, 11, 22, all the way to 5, 11, 22 to 30. And by modulation you mean… So what modulation is… Liquid or subtracting liquid? No. So modulation just means change in flow rate. So what modulation means, there's two ways you can modulate. Okay. So Mr. Horowitz talked about the horizontal ports. That's not an issue. I don't want to talk about the horizontal ports. I don't want to talk about it either. Modulation, the expert is referring to, our expert in that redirect, where he's precisely addressing the exact question they cut him off on, he's saying there is modulation. If you look at the figure in Neuwenhuis, for example, Figure 1 or Figure 3, there's a sheath inlet. So what the expert is saying is, yeah, you can be adding fluid in the vertical inlet, but you're not going to get acceleration because there is no mass conservation problem because you're modulating, that is, you're turning down the sheath inlet fluid that's coming into the system. So the port at the sheath inlet, this is just kind of, again, just to use basic physics because you're asking me, if you're turning down… Can I just say it in really, really dumb terms and see if I'm getting it? Yes. The stuff coming from the beginning. Yes. Right? So if that stayed the same and you added liquid from the vertical, that would probably cause acceleration. We don't have testimony, but I'm willing to accept that, yeah. But what he's saying is Neuwenhuis doesn't necessarily disclose it. It discloses modulation where maybe you're adding, but you're also changing the flow at the beginning, which wouldn't cause acceleration. That is exactly right. Our expert is 100%… It doesn't even have to be exactly right, right? It just has to be plausible because of the standard of review. Absolutely, Your Honor. This is… If it's exactly right and go overboard, go ahead. But we don't have to agree with you. Sure. I won't overdo it because you're exactly right. You are exactly right. Are we really capable of writing that in? I don't know. Let's see. Go ahead. You are exactly right that the question is whether a rational juror could have found that ABS failed to prove, by clear and convincing evidence, that Neuwenhuis disclosed all the elements of the claim. Their expert, again, does not address acceleration in Neuwenhuis. Our expert does and says, no, you're not necessarily going to get acceleration. In fact, you don't in Figure 4. Again, our expert, at length, discusses Figure 4, which is the… Sorry. I'm going to ask it in a dumb way again. Yeah. If you don't get acceleration because there's the modulation, so the fourth beginning is changed, is there any compression, though? No. I don't think there… Again… Here's where I'm still struggling is, that sounds right that Neuwenhuis doesn't always say, automatically, there can be compression, but it does recognize that there can be compression, and compression seems to be acceleration. So what you're telling me about, when you modulate and so you put something in the vertical, but you slow down the flow so there's no acceleration, wouldn't that also mean there's no compression? Well, I don't think necessarily, Your Honor. And again, this is a mass conservation principle. The reason why everyone would say the modulation is the key to the acceleration of the flow rate is, there has to be a constant… What comes in has to come out, right? It has to be the same mass balance in chemical engineering terms, right? Mass balance in, mass balance out. So if you're putting less in, whether there's compression or not, and then you're adding some, as long as the same is coming in and out, total is coming in and out at the same time, then there's no acceleration that needs to be done. So basically, put it this way… I'm trying to follow this, and I think I understand, but that example you just gave us, would that involve any compression or focusing, though? I don't think necessarily, Your Honor, because here, what we have here… Let me just… I won't belabor this because you're running out of time, and you probably want to talk about damages. What I'm concerned is, your example doesn't show acceleration, but it sounds like it also doesn't show compression or focusing, but Newenhouse explicitly discloses some type of compression or focusing. Your Honor, again, the mass conservation doesn't tie to compression, so I can't answer that question. What I will tell you is, our expert, Atleg, their expert does not mention Figure 4 of Newenhouse. Figure 4 of Newenhouse is the computer simulation that's designed to show what's happening in flow cell 2, and he, at length, describes Figure 4, and you can look at it, and what you see there is, as the vertical flow rate increases, these are the three boxes, you see the sample stream, which is the red, yellow, and green bubble. That bumps up. What you don't see is any evidence of compression, and he testifies to this. He says, if there were going to be compression, this is now moving to the compression element, as you brought up, Judge Hughes, you would see it, and the proof of that is, look on the prior page of the Newenhouse, where they're doing the same computer simulation for Figure 1. Friendly question. Is it fair to say the following? It may not be entirely clear what the word compression truly teaches a skilled artisan in Newenhouse in light of Figure 4, but that wasn't your burden. It was theirs, given they were seeking to anticipate, and that the evidence of record, at least, is substantial enough to affirm what was decided. Couldn't have said it better, Your Honor. Agreed. I'm happy to address damages. I think, Your Honor, look, this district court went out of its way, both at multiple junctions in the hearing to review the expert's testimony, narrow it, had a voir dire beforehand, and said, look, I'm going to allow you to testify to some of these disputed issues. What about the fact that the expert didn't appear to take into account non-infringing features that may add value? Your Honor, the expert did take that into account, and that was part of the voir dire colloquy they actually had with the court. Can you show me where that is? Will you say... Yeah, okay, where is that? Yes, let me pull that up for you. That was one of the... Yes. 51089-92. Let me just make sure I'm giving you the right pages. 51089... Let me just maybe look at them before I... I'm going to give him a little more time, because he ran out for rebuttal, so don't worry about the clock right now. All right. I don't see anything on 51089. Okay, let me just... Yes. Ah, here we go. This is... So their challenge... So this testimony that starts on 51089, this is the voir dire about what methodology is using, and this is the diagram in the briefs that both sides reproduce about the... What is this confidential, that confidential one? Let me see if that's confidential. Is that like steps in X's diagram? Yes, yes, the X's, the X's diagram. Is that confidential? Mr. Horowitz, do you know? I don't know. Pardon? I just... The main confidential issue is the pricing. Is the pricing. That's my understanding, too. Okay, so the expert... So to the extent that the expert said which of the steps were crossed off and not, neither of you see any confidential information and acknowledge that. I don't see any confidential. I don't see it. I also don't think we need to refer to specific steps to... Right. Yes, but who knows what the opinion might do, right? So I just want on the record that it's not confidential. Right. And so what you have here is them challenging our expert's use of the very methodology that... And the court points this out, that it was their expert that kind of used this X methodology, right? And our expert crosses out all of the steps that are common to sexing and non-sexing steps in this process. I'm sorry. What page is that thing? It's 58 and 59 of the red brief, Your Honor. This is a terrible reproduction. You realize that. Okay. It gave me something completely blurry and unreadable. Okay, yeah. I mean, I don't think the labels necessarily matter, but the point is that... And this tracks the testimony that I pointed you, 51-090 to 50-92, where basically their argument in this voir dire trying to exclude this methodology was like, hey, look, he's not X-ing out the right steps or X-ing out enough steps or including... And what the judge says is, this is all very good, and this is at 51-092. This is a very good cross-examination, but it's not something that a judge needs to exclude. The methodology is fine. What you guys are arguing over is what are the steps... Or which steps should be taken into account and which ones shouldn't. Which ones should be taken into account and which ones shouldn't. And that's quintessentially a jury question, and they were free to make any of these arguments. And in fact, they did make these arguments to the juror, and the jury here did what a jury's supposed to do. It did not accept the royalty number that our expert submitted. It knocked it down and came somewhere in between the number we submitted and the number they submitted. And the other argument, the other point I would make... What about the smallest saleable unit issue? Yeah, so that one I think is easy, which is why I think Mr. Horowitz didn't bring it up. I think that doesn't help you. So, yeah, so let me explain why the saleable unit doesn't get traction here. That's because the ABS's sales here, the vast, vast majority of their business was selling finished product semen straws. And so the way the expert said, that's what I have data about. Perhaps the only smallable saleable unit, although the judge points out that they didn't propose a true smaller saleable unit, would be the sex-sorting service itself. The problem was, at the time of the infringement, they had entered into, I think, all of two sex-sorting agreements. And so our witness said, that doesn't give me enough data to make a reliable price point. And the court accepted that and said, look, yeah, in light of this, and this is in Commonwealth Scientific, this court has said a number of times, it depends on the facts of the case what data is available. Here, the best available data were the finished straws. And he then, he didn't just use the finished sex semen straws, he subtracted out the un-sexed semen straws to try to isolate what value is getting from sex-sorting. That was step one, the small saleable unit type step. What is your baseline? Are there some sales of just the chips? No, Your Honor. Not to my understanding. I think there is one reference to sales of chips. I don't even know if those are the same chips. And they're certainly not the core of their business. And that's what the judge finds. And so that was step one, saying, okay, I'm going to try to come up with a baseline. I'm going to subtract out the un-sexed straws so I can isolate the sex-sorting services. Then we go to further apportionment on those diagrams, the blurry diagrams that I pointed to you. That's where he's going to say, okay, now I've got the sex-sorting. Okay, jump on the apportionment. You won't take a breath. Okay, I'll try to jump in. Just on the apportionment point one more time here. I've got, hopefully, a better resolution of this chart than I'm staring at. And I see that there are all these Xs and certain things crossed out. And what was not crossed out, does that still incorporate some unpatented features is what I'm trying to get at. Yeah, so I think what their argument would be, and we wouldn't dispute, is this. Once you isolate all of these things out, he's apportioned, apportioned, apportioned. What you're left with is on the chip. The chip has the focusing, the infringing features that we're talking about. The chip also does some other things. Really, the only other thing, I think, that they point to is this region B, which is another form of focusing. And what our expert says, and again, there is testimony on this. The jury could decide this. Our expert said what's driving the value of the chip there is the claimed focusing features. That's driving the value. So the fact that you can't subtract out every single other feature when it's not driving the value, and there's plenty of case law from this court, doesn't render that apportionment infirm. And certainly, remember what they're bringing is exclusion. They want to exclude the expert's testimony. They're saying it's so unreliably excluded. It's a jury question. If they want to try to argue that when our expert said, oh look, the patented features are what's driving the focusing and not this region B that they point to, the jury could have agreed with them and didn't. Okay, thank you very much, Mr. Shaw. Thank you. He went over by almost six minutes, so give an equal amount. Did he have anything left, or was he over? How far over? Like two or three? Six minutes. All right, you can do it without kidding. We'll give you three minutes, which is what you had originally asked for, right? Oh, you asked for fives. Sorry, you're getting three. I appreciate the court's indulgence in any event. Judge Hughes, you asked the question, do compression and acceleration go hand in hand? The best testimony on this is our expert's testimony, and this is where I wanted to start in terms of explaining the background, 50786 of the Joint Appendix, where he explains what happens with focusing by adding sheath fluid. Again, the assumption in all of these cases is you hold all else constant. It is, of course, true that if you turn off things or turn down things or break the chip into pieces, it stops working, but if you use everything exactly the same way and you add fluid to a channel that has constant dimensions, our expert at 786, 50786, explains, you're going to have compression, and with that, you're going to have acceleration. There's no contrary testimony. There's merely the speculation that one could remove sheath fluid elsewhere while adding sheath fluid at vertical position inlet. Newneiss never says that you should do that, and it teaches that there is compression. There is no way a reasonable jury can accept the speculation that it's possible to operate the device in non-infringing ways. Let's say it like that. It's possible to do that. The device absolutely has the capability, and it is the intention that it control the dimensions of the sample. That's with respect to... Can I understand something about 50786? Yes. It seems to be talking about visuals in terms of... Now, you can see there are arrows. They're getting longer. That's what this means. I don't know what it's talking about, and on the prior page, it looks like he has prepared some animations on all of this. Yes, so I can give you the context for that. Yeah, help me, because I don't know what I'm doing. First of all, to the extent that it's useful, the structure of the testimony is, here's how focusing works in the various devices I'm going to talk about, and then he talks about focusing without repeating every time that acceleration happens. So that's why it's not new and high specific. In the blue brief at page 12, you can see the demonstrative that he was using for purposes of explaining focusing by adding sheet fluid, and then on page 13, you can see the focusing by narrowing the channel. That's not what I'm talking about, but I'm just saying these demonstratives link up to what he was talking about. So the arrow's getting longer. They are animations as well, but you can see them even in the picture. The arrows are short, and then they get longer. So that's the correspondence. Just to be clear, this is an expert's demonstrative. It's a demonstrative. His testimony is that all the fluid has to accelerate as the fluid is getting faster. It's very hard to talk about what happens in channels of a millimeter thick without showing some pictures. Is it true that your expert did not give testimony on acceleration in that Neuenhuis reference? He didn't specifically link up acceleration and Neuenhuis in so many words. What he did was he talked about focusing in general and how it works by adding sheath fluid. There were a couple of references. He talked about another reference, Weigel, add sheath fluid. Neuenhuis works the same way. So he doesn't, again, the structure of the direct was here's how focusing works, here's what happens when you add the sheath fluid, and that happens in Neuenhuis. So he didn't specifically go after that. I'd really love, if I may, just on apportionment, if you'll give me 30 seconds. Your Honor. Mr. Shaw pointed the court to the voir dire 51089. I'd like to bring you to exactly the same place. And I think he admitted this. Maybe this isn't even necessary. At the top of 51089, did you make any determination of the technical benefit of having completely non-overlapping features, which is the infringing features as opposed to the non-infringing ones? Answer, no. Mr. Shaw admitted. He stopped at the chip. The problem is that there are non-infringing features of the chip. They're important. What about the statement about it driving the value? What's your response to that? Mr. Shaw's point is, the expert doesn't need to do any further apportionment. So it can be 100% if he says, that's driving the value. Respectfully, that's not what the cases say. Wait, wait, wait. I think that you're just too fast and loose with this. If the expert says, I've considered the non-infringing features, and they're not what's driving the value of this device or straw or whatever it is, what's driving the value is actually the patented features. Hasn't he done exactly what our case law requires? He may not agree with it, but... So when it comes to the technical features, he can't just say it's not driving the value. He has to rely on Dr. Vaca. The page I just pointed you to, 51089, he's asked, did you make this division? And he says, I didn't slice it like that. That's a Vaca question, as in that's a technical question. So he didn't actually even do it. He said the words, I think, that are driving the value. He shouldn't have been allowed to say any words because he stopped at the chip, admitted that he stopped at the chip, and admitted that further apportionment is a technical question. Is there an objection made to stop him from saying those words? The whole Daubert motion is he didn't apportion. Okay? There wasn't an objection once he started talking. Yeah, that's what I was asking. Why the trial did you try to object to stop him from saying the words? I think the question of whether he should have been allowed to testify is clearly preserved. The question of whether that specific Q&A should have been excluded. We're not appealing the issue. We didn't object at that time. It was pretty clear where the court was. And also, he goes on, help me understand, maybe I'm misunderstanding this testimony, but literally right after the section you read, he goes on to say, Your Honor, if I may, I started looking at the economics associated with sexing, and then I identified the six steps that are associated with the economic benefit. Yeah. Doesn't that mean, like, the value? So if you, again... So it does sound like he is claiming he did do some of what you're saying he didn't do. If you go to the blue brief on page 78, I think this is the simplest explanation. And again, Mr. Schott didn't disagree with this. He did apportionment to a degree. He said two steps. There's a disagreement about the number, frankly. That wasn't what the Daubert issue was about. Two steps were attributable, carried out by the chip. That's what it says. Carried out by the chip. Six total. Therefore, 33% attributable to the pens. He did the apportionment to the chip level. There is absolutely no dispute that there are non-infringing features of the chip. They previously accused them of infringement. At summary judgment, that theory was rejected. Our non-infringing chip doesn't... has the non-infringing features and not the ones that are accused of infringement. Lawyers make lots of arguments. That doesn't necessarily mean those are the value. Like, they're going to accuse everything of infringement. It's not zero. Nothing infringes. I mean, that's the nature of what you do. The point is, they attribute zero value. They say 100% comes from these infringing features. 100% of the chip is the pens. He doesn't go further. And in the voir dire, he says, further slicing. That's a Vaca question. Vaca didn't do it. He didn't do it. It was incumbent upon him to make the apportionment. He failed to do so. This testimony should have been excluded. We thank both counsel. The case is taken under submission.